IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TREVOR PINDER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-03479 |
| | § | |
| BRIAN SKERO, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is a motion for summary judgment filed by Defendants Brian Skero ("Skero") and Montgomery County, Texas ("the County") (together, "Defendants"). [Doc. 37]. Plaintiff Trevor Pinder ("Pinder") filed his opposition. [Doc. 41]. Pinder also filed a motion to strike an expert report attached to Defendants' motion [Doc. 40], to which no response was filed. Having considered the Parties' briefs, summary judgment evidence, and the relevant law, the Court **GRANTS** Plaintiff's Motion to Strike and **GRANTS** Defendants' Motion for Summary Judgment.

### I.    Factual and Procedural Background

On the night of November 29, 2014, Skero pulled over Pinder in a traffic stop that escalated into a physical conflict. Despite the inclusion of dash cam video evidence, this case involves highly disputed facts. How the escalation occurred and whether Skero's use of force was justified are both disputed.[1]

At approximately 12:40 a.m.[2] on November 29, 2014, the video shows that Pinder was driving on Texas Farm to Market Road 1314 when Skero made a U-turn [Doc. 37-1 at 0:26] and

---

[1] Importantly, Plaintiff has not filed any summary judgment proof to support his claims; therefore, his factual contentions as set out below are only based upon bare assertions except in those instances where they are supported by the video.

[2] The time has not been established in the exhibits from either Party. Defendants allege the time in their Motion for Summary Judgment. [Doc. 37 at 4].

pulled behind Pinder in his official patrol vehicle. [*Id.* at 1:30].[3] The video shows Pinder made a right turn onto Texas State Highway 242 without using his turn signal, and Skero followed. [*Id.* at 1:34]. The video shows that Pinder rapidly accelerated, almost out of sight of Skero's dash cam, after which Skero struggled to catch up. [*Id.* at 1:41-2:14]. Pinder's vehicle drifted over the right lane stripe. [*Id.* at 2:13]. Pinder's car comes more clearly into view when he slowed down behind an eighteen-wheeler. [*Id.* at 2:15-25]. His car appeared to be tailgating the eighteen-wheeler, although Pinder alleges he was driving behind it at a safe distance. [Doc. 14 ¶ 18].

Pinder then made a left turn into a residential neighborhood as Skero engaged his vehicle's lights but not the sirens. [Doc. 37-1 at 2:25, 2:31]. Pinder stopped his vehicle on the side of the road. [*Id.* at 2:35-40]. Skero pulled over behind Pinder's car.

As Skero walked to Pinder's car, the audio indicates that Pinder initiated a call in his car.[4] [*Id.* at 3:10]. Skero walked to the left side of the car and stopped at the driver's side, where he asked for Pinder's driver's license and insurance. [*Id.* at 3:17]. For approximately thirty seconds, Skero asked Pinder to hang up the phone four times. [*Id.* at 3:28-52]. Pinder did not do so. During one of these commands, Skero referred to Pinder by name. [*Id.* at 3:40]. Pinder alleges that Skero identified him without seeing his license or registration.[5] [Doc. 14 ¶ 29]. Pinder finally hung up the phone when Skero told him to step out of the vehicle. [Doc. 37-1 at 3:59]. At that point, while still seated in the car, Pinder asks Skero what he did wrong. [*Id.* at 4:04, 4:06]. Skero responded,

---

[3] On that night, Skero testifies that he was working overtime on DWI enforcement. [Skero Depo. Doc. 41-1 at 182:7-8]. Skero stated that the first time he saw Pinder's vehicle was when he saw it pull out of a bar parking lot, at which point he followed the vehicle. [*Id.* at 185:11-14]. In the video, Pinder's car was not visible, or at least not identifiable, until Skero reached the intersection where Pinder made a right turn without using his indicator lights. [Doc. 37-1 at 1:34].

[4] Pinder claims that he was trying to call his wife to explain that he had been pulled over. [Doc. 14 ¶¶ 22-23].

[5] Pinder claims that Skero never provided an opportunity for Pinder to produce his license and registration. [Doc. 14 ¶ 39]. The video shows Skero reaching and holding something small with his left hand in the video seconds before identifying Pinder by his name. [Doc. 37-1 at 3:53, 4:00]. Skero stated in his deposition that "I think I asked for a driver's license and insurance. I want to say he gave it to me, his driver's license, and that's how I knew who he was." [Skero Depo. Doc. 41-1 at 186:21-23].

"For one thing you were doing 89 in a 60 and you were unable to stay in your lane." [*Id.* at 4:23]. Despite being asked to step out of the car, Pinder did not comply. Skero then asked Pinder to get out of the car two more times before he complied. [*Id.* at 4:07, 4:36]. As Pinder exited his vehicle, he continued to ask what he did wrong, to which Skero responded "I told you already" and that "when you come [sic] off 1314 and turned onto 242 and gunned it, then you caught up, got in behind that eighteen-wheeler, you were doing 89 miles an hour." [*Id.* at 4:43, 4:51].

Skero testified in his deposition that he also suspected Pinder of driving while intoxicated at this time and intended to conduct a field sobriety test: "[H]e's not listening to me, not listening to anything I'm asking him, other than give [sic] me his license. He did ask me why I stopped him. I told him. It's like he wasn't comprehending it. I could smell the alcohol. I could just look at him, he had red bloodshot eyes. . . . I had him walk to the back of his vehicle in front of my patrol car to do DWI field sobriety." [Skero Depo. Doc. 41-1 at 187:13-25]. Skero acknowledged that he did not tell Pinder he was planning to do a field sobriety test. [*Id.* at 188:1-3].

Pinder, upon exiting his car, walked behind the car. [Doc. 37-1 at 5:18-5:24]. Skero told him to keep his hands out of his pockets. [*Id.* at 5:24]. Skero then asked him to stand in a specific spot behind the vehicle and pointed to demonstrate where. [*Id.* at 5:27]. Pinder moved closer to the spot but not to the location indicated by Skero. [*Id.* at 5:31]. Skero pointed to the spot on the ground again and asked Pinder to stand there two more times. [*Id.* at 5:36, 5:42]. Pinder did not move from where he was standing, and instead took something out of his left jacket pocket and asked again what he had done wrong. [*Id.* at 5:42-45]. It is not apparent from the video what Pinder was taking out of his pocket, but their dialogue indicates it might have been a piece of candy.

> P:   What I do wrong, sir?
> S:   Don't be eating on that.
> P:   Question. Simple question.
> S:   Tired of having to tell you to stop eating on candy.

[*Id.* at 5:45-51]. Pinder attempted to put the substance in his mouth, and Skero grabbed Pinder's hand and pulled it away from his mouth, saying "stop." [*Id.* at 5:52]. Pinder alleges he was simply trying to eat candy. [Doc. 14 ¶¶ 53-55]. (Obviously, candy could be used to mask the smell of alcohol.) Skero later testified that he viewed this gesture as a potential threat, as he did not know whether it was actually candy or another substance, such as a narcotic or drug that could make Pinder more difficult to handle. [Doc. 41-1 at 196:17-197:25]. He did not voice any of these concerns during their interaction. After Skero initially grabbed Pinder's hand containing the substance, the video shows they began to struggle as Skero tried to gain control of both of Pinder's hands.

The two men can be seen struggling, and at one point Skero managed to grab both of Pinder's hands. [Doc. 37-1 at 5:52-53]. During the struggle, Skero told him "stop" and "don't do this" but Pinder continued to scuffle. [*Id.* at 5:52, 5:55]. At this point, Pinder managed to free his arm and pulled his right hand backwards. [*Id.* at 5:52]. The Parties dispute the significance of this arm movement. Pinder alleges, with no supporting evidence, that he pulled his hand away in a "reflexive action." [Doc. 14 ¶ 57]. Skero testified that he was trying to grab the object that Pinder was holding when he started to put it in his mouth, and "then he grab[bed] me and raise[d] his arm like he was going to punch me . . . ." [Skero Depo. Doc. 41-1 at 188:21-24]. Skero avers that Pinder grabbed him and "brought his hand back up in a swinging motion," so Skero placed him in a chokehold. At this point they were still standing. [*Id.* at 189:20-23, 190:15-16]. Skero testifies that Pinder then grabbed the wire on his earpiece to his radio and elbowed Skero in the face, which is what led him to bring Pinder to the ground. [*Id.* at 189:20, 191:18-20, 192:5-8]. During this exchange, the events occurred rapidly and the definition in the video is not such that the viewer can pinpoint each exact movement but Skero's version of the facts is not controverted. Because

the events leading up to the takedown occurred quickly and the video is inconclusive, the Court notes that it has to rely on Skero's sworn description as this is the only available and admissible summary judgment evidence regarding the takedown.

Soon after Pinder's arm movement, Skero grabbed Pinder, and the two of them went down and ended up rolling on the grass off the side of the road. The roadside appeared to have a slope, and the duo rolled off camera. While they were offscreen, Skero radioed for backup: "433 give me a unit." [Doc. 37-1 at 5:58]. When their heads once again became visible onscreen seconds later, the two were still clearly struggling on the ground. Skero was located behind and on top of Pinder and held Pinder in a headlock with his right arm. [*Id.* at 6:05]. Skero punched Pinder in the face or upper body area twice while they were on the ground and yelled "stay on the ground." [*Id.* at 6:06-07]. Pinder refused to follow this command and kept trying to get up. Skero kept Pinder in a headlock and reached for his radio. [*Id.* at 6:13]. At one point, Pinder was on his knees with Skero behind him, and then Skero forced him to the ground. [*Id.* at 6:24]. Skero repeated the instruction to stay on the ground. [*Id.* at 6:31]. Pinder appeared to struggle to get back on his knees, and Skero once again forced him back to the ground. [*Id.* at 6:35].

During this struggle, Pinder made several comments over the course of about one and one-half minutes, including that he could not breathe [*Id.* at 6:39, 6:58, 7:06], was not resisting [*Id.* at 6:45-50], was not doing anything wrong [*Id.* at 7:32], and needed help [*Id.* at 7:52], mixed among several profanities directed at Skero [*Id.* at 6:48, 7:51, 7:54]. Pinder's words suggest a situation worse than what the video reveals, as it is apparent that Pinder was resisting Skero's attempts to handcuff him and that he could breathe because he kept talking without apparent difficulty. During this part of the struggle on the ground, Skero called into dispatch two more times and told Pinder to stay there and not move and he would not get hurt. [*Id.* at 7:01, 7:31, 7:56-58].

After about two minutes of remaining somewhat still (as Skero waited for backup), Pinder again began to struggle against Skero and attempted to grab Skero's radio. [*Id.* at 8:49]. Skero struggled to stay on top of him. [*Id.* at 8:58]. Notably, Skero had his right arm around Pinder's neck for about three minutes total at this point, including when Pinder took hold of the radio and yelled into it "please help me." [*Id.* at 8:59]. Skero then punched Pinder at least twice in the back of the head and strengthened his headlock on him. [*Id.* at 9:01]. Pinder continued to yell into the radio and would not release it. [*Id.* at 9:02]. At that point, Skero released the chokehold to grab his taser and warned him "you're going to get tased. You better let go of that radio." [*Id.* at 9:10-12]. Although muffled, Pinder appeared to respond, "you wouldn't tase me." [*Id.* at 9:18]. He did not release the radio. Skero tased Pinder in the back of the neck and yelled again to let go of the radio. [*Id.* at 9:19-21]. It is unclear from the video if Skero deployed the taser more than once. Although Pinder showed little or no reaction to being tased, he released the radio and tossed it a short distance away from him. [*Id.* at 9:25].

A voice over the radio asked Skero to check in, and Skero asked for backup units. [*Id.* at 9:25-28]. The dispatch responded "yes sir, you're on priority." [*Id.* at 9:30]. Over the next few minutes before backup units arrived, Pinder and Skero remained on the ground with Skero straddling Pinder's back to hold him down. Pinder continued to talk, calling Skero a series of expletives ("m-------r") and insults ("little boy"). [*Id.* at 10:33, 9:37]. Pinder also continued to contend that he did not do anything wrong and was not fighting him. [*Id.* at 10:27, 10:48]. Pinder said, "Brother, I ain't doing nothing wrong. I am doing nothing wrong. I promise you, I ain't fighting you. I ain't trying to do nothing wrong. You are f-----d up, bro. And are you going to get into any trouble? No. Because you're an officer. I know the f------g game. I am not doing anything wrong." [*Id.* at 10:48-11:17]. All that Skero said during this exchange was demanding that Pinder

give him his hands, which Pinder did not do, and instructing him to stay on the ground after Pinder

began to move his legs again. [*Id.* at 10:34, 11:28]. Skero remained on top of Pinder without further

struggle for approximately four minutes and fifteen seconds after deploying the taser before a

second police officer finally arrived on screen. [*Id.* at 9:19-13:35].

When another officer reached the spot where Skero and Pinder were located, that officer

told Pinder to put his hands behind his head and to give them his arms. [*Id.* at 13:44-46]. Pinder

kept his arms tucked under his chest and still did not comply. [*Id.* at 13:47]. The officer again

instructed him to give them his arms or he would be tased. [*Id.* at 13:51]. Skero got off Pinder's

back, and he and the second officer attempted to grab Pinder's arms to handcuff him. [*Id.* at 14:00].

Pinder continued to resist, and the video shows that the two officers struggled to handcuff him for

about forty seconds before they finally succeeded in restraining his arms (during which Pinder

repeated that he was "not fighting nobody"). [*Id.* at 14:00-47]. Skero walked away to sit by the

police car breathing heavily and sat down while the second officer placed the cuffs on Pinder. [*Id.*

at 14:54-15:05]. The remainder of the video shows several other officers arriving on scene and

records some of their dialogue but shows no further interactions between Pinder and Skero.

Subsequent blood tests and state judicial proceedings occurred, some of the results of

which were discussed at the motion to dismiss stage.[6] It is undisputed that Pinder later pleaded

guilty to a charge of Driving While Intoxicated related to that night. [Doc. 7, Exs. 1, 2].

Pinder filed this lawsuit under Section 1983 against Skero and Montgomery County,

Skero's employer. Pinder's description of his injuries in his Amended Complaint is limited to these

---

[6] In that opinion, this Court's predecessor noted: "This Court finds it appropriate to take judicial notice, under Rule 201 [of the Federal Rules of Evidence], of both the Judgment of Probation Conviction by Court and the Texas Department of Public Lab Result. Docs. 7-1 and 7-2. Both documents are not subject to reasonable dispute and their accuracy cannot be reasonably questioned." [Doc. 24 at 6]. Although neither Party disputes these facts, it is arguable whether judicial notice is the proper vehicle for a lab report or prior conviction at the summary judgment stage. The Court does not need to resolve the question in this opinion, as it is not necessary to decide the larger question whether summary judgment is appropriate, and the Court does not consider these records in its decision.

statements: "As a direct and proximate result of the conduct of the Defendants . . . Plaintiff has suffered losses and damages." [Doc. 14 ¶ 105]. "Specifically, Plaintiff felt frightened, humiliated, embarrassed and suffered severe mental anguish from the arrest, from being detained in prison . . . Plaintiff continues to suffer mental anguish that interferes with his ability to carry out the day-to-day responsibilities of life and to enjoy life . . . In addition, Plaintiff suffered damage to his reputation as a result of this incident. Plaintiff also suffered extreme physical discomfort as a result of this incident." [*Id.* ¶¶ 106-107, 110]. He also claims that he lost his job as a result of the arrest. [*Id.* ¶¶ 109, 111]. Pinder submitted no evidence for consideration as summary judgment evidence or further briefing regarding his injuries.

The Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) and on qualified immunity grounds [Doc. 17], and the Court denied the motion. [Doc. 24]. Defendants filed their joint motion for summary judgment [Doc. 37], and Pinder filed his opposition. [Doc. 41]. Pinder also filed a motion to strike an expert exhibit attached by the Defendants to their motion for summary judgment. [Doc. 40]. Both motions are now ripe for review.

## II.    Motion to Strike (Doc. 40)

Before turning to the motion for summary judgment, the Court must dispense with the motion to strike, as it concerns what evidence can be considered at this stage. Defendants submitted an affidavit and report from Robert Hauck ("Hauck"), who is presented as an expert "in the field of law enforcement, security, police procedures, police policies, crime analysis, crime prevention, crime scene investigations, internal investigations, and public safety." [Doc. 37-2]. Defendants, however, did not establish why Hauck is an expert regarding the facts at issue in this case (such as being an expert in traffic stops or an expert in particular uses of force or dealing with a recalcitrant subject). Furthermore, most of the purported evidence provided in Hauck's report is stated in

conclusory form. Finally, and most importantly, Defendants did not respond to the Motion to Strike, which, under the local rules of this Court, is an admission of "no opposition." LR 7.4.

The Court, therefore, **GRANTS** Plaintiff's motion to strike [Doc. 40] Hauck's affidavit and report as they pertain to the pending summary judgment motion. This holding, however, should not be construed to prohibit Hauck's expert testimony, if in a later proceeding he is properly qualified and the evidence is properly introduced.

### III.    Legal Standard for Summary Judgment and Qualified Immunity

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

Once a movant submits a properly supported motion, the burden shifts to the nonmovant to show that the court should not grant the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-25 (1986). The nonmovant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Even in the context of a qualified immunity defense, the court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the nonmovant's favor. *Rosado v. Deters*,

5 F.3d 119, 122-23 (5th Cir. 1993). The court cannot make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

There is, however, an additional wrinkle when video evidence is available. When one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016).

## IV.    Evidentiary Issues

In support of his argument against summary judgment, Pinder's proferred "evidence," to the extent it constitutes valid summary judgment evidence, largely focuses on the question of municipal liability. The Court will address some of the overarching evidentiary concerns before turning to the merits of the arguments.

In reference to the excessive force claim against Skero, Pinder's entire presentation is limited to his allegations in his briefing, Skero's deposition testimony, the video recording of the stop, and references to this Court's order on Defendants' Motion to Dismiss [Doc. 24]. Pinder has included no sworn affidavit or deposition to provide his view as to what occurred.

The second evidentiary issue arises out of Pinder's failure to cite to specific evidence in his summary judgment response regarding his Section 1983 excessive force claim. Pinder references the video recording generally but does not provide any particular citations to it or to any other exhibits. A district court is not prohibited from considering evidence not specifically cited to in the briefing, however, the Fifth Circuit has made clear that "Rule 56 does not impose

upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment, especially where, as here, the nonmoving party is well aware of the existence of such evidence. Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992); *see also Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988). As is obvious from the above factual recitation, this Court has reviewed all admissible evidence and the video of the encounter in minute detail, but emphasizes that Plaintiff's allegations and contentions are not evidence.

The third overarching issue requiring discussion is Plaintiff's apparent reliance on this Court's order [Doc. 24] denying Defendants' motion to dismiss. Throughout Pinder's response to the motion for summary judgment, he cites to the Court's order as conclusive support for his allegations that the force Skero used was excessive. This reliance is misplaced. That order is not a finding of fact nor is it summary judgment evidence. It was issued using a totally different standard than that used at the summary judgment phase.

In that order, the Court clearly indicated that it was utilizing the standards applicable to a 12(b) motion, where all allegations made by a plaintiff must be taken as true in order to determine whether he or she has sufficiently pleaded a claim upon which relief could be granted. The determination of whether a complaint was sufficiently pled to withstand a motion to dismiss exerts a lower standard on the plaintiff. The language used in that order reinforces this notion: The Court indicated that its description of the facts in the case was based *only* on the allegations in Pinder's

First Amended Complaint, Doc. 14, and the video recording attached to it, Doc. 14-1. [Doc. 24 at 1]. The Court also noted that "statements made by Defendants regarding facts of the night in question will not be considered to the extent that they are inconsistent with Pinder's allegations or the video evidence." [Doc. 24 at 7]. In comparison to the standard applied to a Rule 12(b) motion, at the summary judgment phase the Court can only consider all properly submitted evidence.

The next issue involves the admissibility of Pinder's "evidence" regarding the County's alleged liability under the *Monell* doctrine. The Advisory Committee 2010 note to Federal Rule of Civil Procedure 56 explains that "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56, advisory committee note 2010 amend.; *see also Valentine v. Hodnett*, No. 5:14-cv-72, 2015 WL 12942069, at *3 (S.D. Tex. Sept. 16, 2015). The adverse party—the nonmovant—must provide competent summary judgment evidence to demonstrate the existence of an issue of material fact. *Celotex*, 477 U.S. at 321-25. Pinder has supplied several exhibits consisting of miscellaneous police reports and records. The overwhelming majority of this purported evidence is inadmissible, at least as submitted, and cannot be used to defeat summary judgment because the documents are unauthenticated, do not contain affidavits attesting to their admissibility or accuracy or their contents, or do not indicate that they were "made on personal knowledge" as required by Federal Rule of Civil Procedure 56(c)(4). The only exhibits attached to Pinder's opposition brief that were properly authenticated are the depositions of Skero and Sergeant Arturo Looza, the County's designated Rule 30(b)(6) representative for Precinct 4, the governmental unit for which Skero worked at the time. That being the case, they are all this Court can consider.

## V.    Discussion

Pinder has asserted a Section 1983 claim against Skero for excessive force under the Fourth Amendment and a Section 1983 claim against the County for having (1) a "policy, procedure, custom, practice, or protocol of inadequately training, supervising, and/or disciplining its officers which was the moving force behind Plaintiff's injuries," (2) shielding its officers from the consequences of engaging in improper or illegal conduct, and (3) permitting its officers to engage in improper or illegal actions. [Doc. 14 at 15, 18-19]. The Court will evaluate the claims against each Defendant in turn.

### A.  Deputy Skero

Skero argues that he is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016). "Once a defendant raises the defense of qualified immunity it becomes the plaintiffs' burden to show that it does not apply." *Jones v. Lowndes Cty., Miss.*, 678 F.3d 344, 351 (5th Cir. 2012) (citing *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005)).

The Court must engage in a two-step analysis to determine whether Skero is entitled to qualified immunity. First, the Court must assess whether a statutory or constitutional right would have been violated on the facts alleged. *Griggs*, 841 F.3d at 312 (citing *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)). Second, the Court must "determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person

would have known." *Id.* at 313. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, -- U.S. --, 136 S. Ct. 305, 308 (2015). There need not be a case directly addressing the action, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* These two steps of the qualified immunity inquiry can be conducted in any order. *Pearson*, 555 U.S. at 236.

In excessive force cases, "the second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

i.    Clearly Established Law

The Fourth Amendment right to be free from excessive force during a seizure is clearly established. *See Poole*, 691 F.3d at 627. The first inquiry that the Court addresses is what law regarding these specific types of force was clearly established at the time of the incident, before turning to the reasonableness of Skero's actions in the following subsection. The Fifth Circuit has explained the "clearly established" prong as follows:

> Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be "on notice that their conduct is unlawful." *Saucier*

> *v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The central concept
> of that is that of "fair warning": The law can be clearly established "despite notable factual
> distinctions between the precedents relied on and the cases then before the Court, so long
> as the prior decisions gave reasonable warning that the conduct then at issue violated
> constitutional rights." *Hope* [*v. Pelzer*], 536 U.S. [730] at 740, 122 S.Ct. 2508 [153 L.Ed.2d
> 666 (2002)] (internal quotation marks omitted).

*Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc). As a result, the corollary question

is whether the law on the use of takedown maneuvers, chokeholds, and tasers was clearly

established at the time before the incident between Skero and Pinder, such that Skero could have

been on notice on the night of November 29, 2014.

The Fifth Circuit has made clear that police are "entitled only to 'measured and ascending

responses' to the action of a suspect, 'calibrated to the physical and verbal resistance' shown by

the suspect." *Chacon v. Copeland*, 577 F. App'x 355, 362 (5th Cir. 2014); *see Galvan v. City of*

*San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010). In the instant case, while there did not appear

to be verbal resistance, there was physical resistance and deliberate failure to follow the officer's

directions. In turn, several escalating uses of force were employed by Skero as the situation

developed: a takedown maneuver, an alleged chokehold, and, finally, deployment of a taser.

With regard to takedown maneuvers to secure a suspect's compliance, Fifth Circuit caselaw

emphasizes passive resistance and flight risk as important factors to consider:

> [W]e conclude that on the night Officer Rogers stopped Hanks [February 2013], clearly
> established law demonstrated that an officer violates the Fourth Amendment if he abruptly
> resorts to overwhelming physical force rather than continuing verbal negotiations with an
> individual who poses no immediate threat or flight risk, who engages in, at most, passive
> resistance, and whom the officer stopped for a minor traffic violation. *See Deville*[ *v.*
> *Marcantel*], 567 F.3d [156,] 167–69 [(5th Cir. 2009)] (finding qualified immunity
> inappropriate where, taking the facts in the light most favorable to the plaintiff, an officer
> making a minor traffic stop overpowered an individual who displayed, at most, passive
> resistance, and presented no safety or flight risk); *see also Doss v. Helpenstell*, 626
> Fed.Appx. 453, 459–60 (5th Cir. 2015) (unpublished) (construing *Deville* as clearly
> establishing that an officer should receive no qualified immunity if he "quickly escalate[s]"
> an encounter with a non-threatening, passively-resisting driver who posed little risk of
> escape by employing overwhelming force "rather than continu[ing] to negotiate") . . . .

*Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017). Where suspects have resisted or demonstrated a threat to officer safety, however, the Fifth Circuit has not found the use of takedown maneuvers to be objectively excessive or unreasonable. *See Poole*, 691 F.3d at 629. In *Poole*, the individual suspected of driving while intoxicated would not turn around or give up his right arm when instructed, so officers briefly tased him and then took him to the ground. *Id.* Review of the clearly established law in 2014 suggests that use of a takedown maneuver would be appropriate where a suspect is resisting arrest or posing a threat to the officer(s) at the scene.

Turning next to the use of chokeholds or headlocks, the Fifth Circuit has applied a similar standard. "[W]e have found that a police officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is not resisting arrest." *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 732 (5th Cir. 2018). In *Darden*, the Fifth Circuit addressed whether choking a suspect, along with kicking and punching him, was excessive force. What the Court described applies equally here: "Thus, if a jury finds that no reasonable officer on the scene would have perceived Darden to be actively resisting arrest, then a jury could also conclude that Officer Romero used excessive force by choking Darden and repeatedly punching and kicking him in the face." *Id.* The central question is whether the suspect actively or passively resisted arrest leading up to the officer's use of force. *See id.* at 733.

Finally, in 2013 the Fifth Circuit summarized what law was clearly established at that time regarding the use of tasers in *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013):

> In *Newman v. Guedry*, we addressed whether the law on the use of tasers was clearly established at the time of an event that occurred *before* the incident between Ramirez and Martinez:
>> Guedry contends that he had no reasonable warning that tasing Newman multiple times violated Newman's constitutional rights, because there was then no binding caselaw on the appropriate use of tasers. Lawfulness of force, however, does not depend on the precise instrument used to apply it. Qualified immunity will not

protect officers who apply excessive force merely because their means of applying it are novel.

703 F.3d 757, 763–64 (5th Cir. 2012) (footnotes omitted).

In *Poole*, the Fifth Circuit explained in 2012 that use of a taser against an individual suspected of driving under the influence and who resisted arrest was not clearly unreasonable or objectively excessive. 691 F.3d at 629. The officers' actions in that case were justified because they responded to the situation with "'measured and ascending' actions that corresponded to Poole's escalating verbal and physical resistance" where Poole's resistance was "immediate and persistent." *Id.* The inquiry regarding use a taser is highly fact-intensive. As with takedown maneuvers and chokeholds, the central questions regarding use of a taser are whether the suspect posed a threat or actively resisted arrest.

### ii.     Violation of a Constitutional Right

As previously stated, the Fourth Amendment right to be free from excessive force during a seizure is clearly established. *See Poole*, 691 F.3d at 627. The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 398.

"Succinctly stated, a plaintiff must show (1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Griggs*, 841 F.3d at 312 (citing *Poole*, 691 F.3d at 628). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville*, 567 F.3d at 167 (quoting *Graham*, 490 U.S. at 396).

No evidence has been submitted regarding Pinder's injuries nor was further description offered in his opposition to summary judgment. In his Amended Complaint, Pinder alleges

suffering "extreme physical discomfort" caused by the incident. [Doc. 14 ¶ 110]. He also alleges mental anguish and reputational damage. [*Id.* ¶ 106-09]. "Although a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is directly related to the amount of force that is constitutionally permissible under the circumstances." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017). "Any force found to be objectively unreasonable necessary exceeds the *de minimis* threshold." *Id.* (internal quotations omitted). "[A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.* (quoting *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013)). Although it is not clear that Pinder can meet this prong, as no evidence was even submitted on the topic, the Court defers the issue and turns to the question of the reasonableness of Skero's conduct.[7]

In making a determination regarding the reasonableness of the alleged excessive force at issue, a court should consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

### a. *Graham* Factor One: Severity of the Crime at Issue

The Court first considers whether the severity of the relevant crimes weighs in favor of the uses of force exerted. In addition to the obvious traffic violations, Skero testified that he suspected Pinder of driving while intoxicated and that once their interaction outside of the car began, Pinder resisted arrest [Doc. 37 at 13] and "cocked" his arm back as though to strike him. [Skero Depo.

---

[7] The Court remains mindful of the fact that Pinder (as per the video) was tased by Skero. As stated earlier, when tased, Pinder showed little or no reaction to it, nor has he offered any admissible evidence of any resulting injury.

Doc. 41-1 at 189:19-23]. It is also apparent from the video that Pinder had not complied with Skero's instructions up to this point, or at least had ignored the instructions several times, as he refused to hang up the phone multiple times, initially refused to exit his vehicle until the fourth time asked, did not stand where instructed several times, and tried to put an object in his mouth despite being told not to multiple times. Pinder alleges in his Complaint that he was compliant with police instructions, an allegation that is clearly not true, or at most passively resisting, an allegation unsupported by any evidence from Pinder himself.[8] [Doc. 14 ¶¶ 41, 48, 50, 67]. Pinder contends in his response to the Motion for Summary Judgment that because Skero only listed traffic violations as the cause for the stop in their conversation, that use of force was not warranted and should have been proportionate to the traffic violations. [*See* Doc. 41 at 3-4].

Although Pinder's actions leading up to putting the object in his mouth were not severe offenses, the combination of apparent intoxication, repeated noncompliance, pulling his hands away from Skero's grasp, and jerking his right arm back into a striking stance could raise a concern for a reasonable officer that violence or more aggressive resistance was imminent—facts which transform a mere traffic stop into a more severe situation. The Court finds that a reasonable officer confronted with these circumstances could anticipate the need to restrain Pinder. Although the takedown occurred quickly, the Court finds that Pinder's resistance and the perceived risk to Skero's safety, which is discussed in more detail below, weigh in favor of Skero's use of a takedown maneuver. *See Poole*, 691 F.3d at 629.

Once the two men were engaged in a physical struggle on the ground, the severity of Pinder's conduct increased. The video shows that he forcibly resisted Skero's efforts to bring him to the ground and was strong enough to get up despite Skero having his arm locked around his

---

[8] Obviously to the extent the video provides evidence that supports Pinder, the Court can consider the video.

neck and placing his full weight on Pinder's back. The Fifth Circuit has clearly stated that officers are "entitled only to 'measured and ascending responses' to the action of a suspect, 'calibrated to the physical and verbal resistance' shown by the suspect." *Chacon*, 577 F. App'x at 362. A reasonable officer on the scene could have perceived Pinder, at this point on the ground, to be actively resisting arrest, especially considering Pinder's continued ability to talk and struggle throughout the entirety of the "chokehold." *Cf. Darden*, 880 F.3d at 732 ("[W]e have found that a police officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is *not* resisting arrest.") (emphasis added). Again, this weighs in favor of Skero's use of force.

Similar considerations apply to Skero's deployment of his taser. While they were struggling on the ground, Pinder—who had refused to yield his arms to be cuffed and who had previously been able to match Skero's weight and size—grabbed Skero's radio, despite being held in a chokehold, and began yelling into it. In addition to resisting arrest, Pinder's ability to grab Skero's equipment could lead a reasonable officer to fear increasing levels of violence. When instructed to release the radio, Pinder refused and continued to not comply despite the warning that he would be tased. The severity of engaging in a physical altercation, taking and using police equipment, and resisting arrest weighs in favor of Skero's perceived need to deploy a taser in response to an escalating situation. This is especially true considering that Skero specifically warned Pinder that he would be tased if he did not relinquish the radio.

b. *Graham* Factor Two: Threat Posed by the Suspect

The Court next considers whether the second factor, whether Pinder posed an immediate threat, weighs in favor or against Skero's takedown maneuver, alleged chokehold, and taser deployment. Skero testified to several factors that made him believe that Pinder was a threat, both to him and to public safety. First, he stated in his deposition that Pinder smelled of alcohol and had

bloodshot eyes, and as such would be a danger to the public by driving while intoxicated. [*See* Skero Depo. Doc. 41-1 at 187:13-18]. Second, Skero explained that he did not know the contents of the wrapper that Pinder was trying to put in his mouth, and that he thought it could have been drugs. [*Id.* at 196:2-21, 197:1-3]. Skero mentioned he even worried it could be a drug that Pinder would throw on him. [*Id.* at 197:12-25]. Third, Skero testified that Pinder cocked his arm back as if to hit him [*Id.* at 190:15-17], and later grabbed at the wire on his radio, deactivating his earpiece, and elbowed him in the face. [*Id.* at 191:13-25, 192:1-8]. Here, again, Pinder asserts, but provides no evidence, that he was moving his arm in a "reflexive action" and that he did nothing that could be construed as a threat or aggressive. [Doc. 14 ¶¶ 56-59]. As previously discussed, the video is inconclusive so the Court relies on the only available summary judgment evidence regarding the events leading up to takedown, Skero's testimony, as Pinder proferred no evidence on the topic.

Once the two men were physically engaged on the ground, Skero appeared to use escalating levels of force to maintain control of the situation. Skero described the struggle as "fighting for his life." [Skero Depo. Doc. 41-1 at 193:9]. He avers that because he had weapons on his person, once started, the struggle had potentially lethal implications. [*Id.* at 193:10-25]. It appears from the video that Skero struggled to maintain control of Pinder, as Pinder was able to get back onto his knees and grab the radio despite being in the alleged chokehold. Skero testified that using the taser (stun gun maneuver) was necessary to maintain control while he waited for backup units to arrive because he was still having trouble maintaining control of the situation. [*Id.* at 202:3-25, 203:1-23]. Pinder alleges in his Amended Complaint that the force used was unreasonable and caused him to fear for his life and react responsively. [Doc. 14 ¶¶ 66, 69, 76]. Again, he provided no evidence or sworn statements to this effect.

After considering the summary judgment evidence including the video, it is apparent that a reasonable officer could have viewed Pinder as an immediate threat. The Court again notes that Pinder has provided no sworn testimony, affidavits, or exhibits to support his assertions, leaving the Court with only the video to compare with Skero's deposition. With regard to the initial takedown, Pinder was clearly intoxicated and purposefully being uncooperative. When he raised his arm, a reasonable officer could have feared that Pinder was trying to initiate violence. Regarding the headlock or chokehold, the available testimony and video demonstrate that Pinder was never in danger, was able to talk without apparent difficulty, and continued to physically struggle against Skero, all while Skero had his right arm around his neck for several consecutive minutes. It is apparent that this technique was used to maintain control of the situation, in which Skero was struggling to keep Pinder under control on the ground rather than to inflict harm. Faced with a physical altercation with a clearly intoxicated suspect who had already engaged in resistance and physical struggles against the officer, the Court finds that a reasonable officer could have feared that Pinder was capable of increasing measures of resistance. Finally, regarding the use of the taser, the summary judgment evidence shows that Pinder continued to try to get up, resisted Skero's attempts to maintain control, and grabbed and used Skero's radio. Even in the face of being warned to relinquish the radio or be tased, Pinder refused to let it go. Under the circumstances, a reasonable officer could view this suspect as posing an increasing threat. A reasonable officer could fear that Pinder might reach next for his gun or escape his grasp or both. The potential threats to officer safety weigh in favor of Skero's use of force.

c. *Graham* Factor Three: Resisting Arrest or Flight Risk

Next, under the third *Graham* factor, the Court considers whether Pinder resisted arrest or attempted to flee. The Parties strongly disagree whether Pinder actively or passively resisted arrest

leading up to the takedown maneuver. Although the video suggests that Pinder was not an active flight risk, it does demonstrate that he was noncompliant throughout the course of their interaction. Pinder refused to yield his hands, began to struggle against Skero while they were still standing, and forcibly resisted all of Skero's attempts to gain control of the situation. Pinder clearly resisted all instructions and physical restraints both before and after the two were engaged in the physical altercation. In fact, even when help arrived and Pinder was outnumbered, he still continued to resist. From the time when Pinder refused to yield his hands to Skero when instructed, a reasonable officer could have perceived Pinder to be resisting arrest, as previously discussed. This factor also weighs in Skero's favor.

### iii.    Conclusion Regarding Skero

Under the circumstances, the Court concludes that it must grant summary judgment on Skero's qualified immunity claim and again stresses the importance of the lack of evidence submitted by Pinder. Without an affidavit attesting to his view of the situation, to find for Pinder would require this Court to find that the video raised an issue of material fact as to what a reasonable officer would do in the situation. All this Court has available to consider is the video, Skero's testimony, and the caselaw. Pinder provided no personal testimony as to any aspect of the encounter and no lay or expert testimony as to the events.

Accordingly, the Court finds that Skero is entitled to qualified immunity for the following reasons: (1) Pinder bears the burden of proof to show that a fact issue exists as to whether the defense of qualified immunity should not apply but provided no evidence on the topic or regarding what a reasonable officer should have done in such a situation; (2) the dash cam video does not raise any issues of material fact; and (3) the Fifth Circuit has granted qualified immunity in situations with police conduct much more "egregious" or questionable than that alleged in the

instant case. *See, e.g.*, *Pratt*, 822 F.3d at 177-78 (affirming grant of qualified immunity where police tased and used a four-point restraint on a suspect who walked away from the officers and refused to stop); *Griggs*, 841 F.3d at 315 ("Brewer's actions [taking down and punching a "drunken, erratic suspect"] may not have been as restrained as we would like to expect from model police conduct, but qualified immunity 'protect[s] officers from the sometimes hazy border between excessive and acceptable force.'" (quoting *Saucier*, 533 U.S. at 206)); *Cadena v. Ray*, 728 F. App'x 293, 296-97 (5th Cir. 2018) (affirming grant of qualified immunity where officers employed a takedown maneuver and taser to secure the arrest of a suspect who refused to place his hands behind his back, backed away from officers, and appeared intoxicated). At the very least, Pinder's conduct in drawing back his arm after not following directions raised a reasonable apprehension that violence was forthcoming. Moreover, Pinder continued to struggle and failed to follow directions even after he was warned he might be tased. Even after additional officers arrived Pinder continued to struggle. Pinder has failed to raise a fact issue that rebuts Skero's qualified immunity defense, and the Court grants summary judgment in favor of Skero on that basis.

B. Montgomery County

Pinder also brings a Section 1983 claim against the County for having (1) a "policy, procedure, custom, practice, or protocol of inadequately training, supervising, and/or disciplining its officers which was the moving force behind Plaintiff's injuries," (2) shielding its officers from the consequences of engaging in improper or illegal conduct, and (3) permitting its officers to engage in improper or illegal actions. [Doc. 14 at 15, 18-19].

It is well established that a municipality is not liable under Section 1983 on the theory of respondeat superior. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). The Fifth Circuit has explained that "[a] municipality is almost never liable for an isolated unconstitutional act on

the part of an employee; it is liable only for acts directly attributable to it 'through some official action or imprimatur.'" *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2001) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). To establish municipal liability under Section 1983, a plaintiff must show "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Id.*

An official policy can be demonstrated in several ways. Either a plaintiff can provide evidence of a "policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's law-making officials or by an official to whom the lawmakers have delegated policy-making authority," *Okon v. Harris Cty. Hosp. Dist.*, 426 F. App'x 312, 316 (5th Cir. 2011), *or* a plaintiff can provide evidence of a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). A plaintiff must provide evidence of a policy or practice, that it was promulgated or otherwise so well accepted as to represent official policy, and that the policy was the "moving force" behind the violation. The "moving force" must be "a direct causal link" between the policy and the alleged violation. *See Piotrowski*, 237 F.3d at 580.

Pinder has provided no evidence of an official or otherwise specifically articulated policy but nevertheless offers several other theories of municipal liability. He alleges that the County had widespread practices of "1) failing to train, supervise, and/or discipline officers for a) how to respond to requests for reasons for officer actions, b) how to deploy de-escalation techniques, c) what constitutes a resisting arrest charge, d) reasonable use of force, and e) how to prepare, draft, and submit truthful use of force reports; 2) shielding its officers from consequences of wrongful conduct; 3) permitting its officer to perform illegal and improper conduct; and 4) ratification."

[Doc. 41 at 7]. In support of his claims, Pinder has provided his briefing and unauthenticated use of force incident reports, which are not proper summary judgment evidence, and the depositions of Officers Skero and Looza (the County's Rule 30(b)(6) designee). The Court has already addressed the evidentiary problems concerning the submission of these exhibits.

Initially it is important to note that Plaintiff has not provided any evidence of any written policy or procedure of the County that in any way impacts this case. For purposes of its analysis, the Court separates Pinder's claims into theories of failing to train or supervise, having a custom or practice of using or allowing excessive force, and ratifying Skero's actions. The Court takes each of these theories in turn.

Pinder first argues that the County is liable because of its alleged deliberate indifference to the need for training in several areas. In support, Pinder points to Skero's deposition testimony where he could not recall what kind of trainings he had, when he attended those trainings, and, at times, the contents of those trainings, as evidence of a lack of training in the County for its law enforcement officers. Pinder also contends that Sergeant Looza, who was designated as the County's representative in response to a Rule 30(b)(6) deposition notice, only approved training class requests for officers and did not oversee what trainings are offered or otherwise handle curriculum. [Doc. 41 at 18]. As a result, because Looza did not have comprehensive knowledge of the County's training programs but is the 30(b)(6) designee, Pinder suggests that his lack of knowledge should indicate a lack of training in the County.

This argument is unavailing. Demonstrating that two officers within the County do not remember what trainings are offered, or even forgot the contents of those classes, does not demonstrate that no trainings or insufficient trainings were offered. At most, it demonstrates that these officers did not pay attention to the trainings they received. While the Court acknowledges

that the best interests of the public are served when officers are informed and up-to-date on their trainings, it cannot impose liability on a County for an individual officer's memory deficiencies.

Moreover, Pinder has not submitted any authenticated evidence that can demonstrate that the County was deliberately indifferent to the obvious need for training within the areas he lists. To hold a municipality liable for failure to train an officer, "it must have been obvious that 'the highly predictable consequence of not training' its officers was that they 'would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk.'" *Peterson*, 588 F.3d at 849 (quoting *Brown v. Bryan Co., Okla.*, 219 F.3d 450, 461 (5th Cir. 2000)). Although Pinder submitted unauthenticated use of force incident reports purportedly involving Skero on other occasions, he has presented no evidence that this Court considered. Even if the incident reports were considered, however, they presented several situations that included even more risk to officer safety than in the instant case, and as such they fail to present an issue of material fact demonstrating that it should have been *obvious* to the County that it was failing to train its officers adequately as to the proper use of force.

Similarly, Pinder has not presented any proper summary judgment evidence that the County was deliberately indifferent to the need to supervise its officers adequately. As with failure to train claims, for the County to be liable for failure to supervise, "it at least must have been obvious that 'the highly predictable consequence' of not supervising its officers was that they 'would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk." *Peterson*, 588 F.3d at 850 (quoting *Brown*, 219 F.3d at 461). Again, no authenticated evidence supports this claim.

The Court turns next to whether Pinder has presented any evidence to raise a fact issue for municipal liability on the basis that the County maintained a policy that was permissive of

excessive force. To meet this burden, Pinder must show some evidence supporting the claim that an official policy or custom was the moving force behind the excessive force that allegedly violated his Fourth Amendment rights, as discussed previously. Pinder argues that Skero has a pattern of excessive force demonstrated by the number of use of force reports involving Skero. He claims, without any admissible evidence for support, that the number of Skero's use of force reports is above average and that the County's findings that those uses of force were justified are sufficient to establish a pattern of excessive force that could be said to represent the County's official policy.

The Fifth Circuit has stated that a pattern can demonstrate an official policy where it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579. "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Webster*, 735 F.2d at 842. A plaintiff thus must demonstrate "a pattern of abuses that transcends the error made in a single case." *Piotrowski*, 237 F.3d at 582. A pattern also requires specificity and similarities, as "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis*, 406 F.3d at 383. Moreover, a pattern requires "sufficiently numerous prior incidents," as opposed to "isolated instances." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989); *Pinada v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (finding that eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry where each of the incidents included some explanatory circumstances).

The record of appropriately proven evidence is woefully inadequate to establish a pattern rising to the level of an official policy or practice. The incidents alleged in the unauthenticated use

of force reports, even if properly proven, do not refer to similar types of force or incidents but instead include an accidental car collision, alleged unlawful entry for a search, and shooting a firearm at a fleeing subject. While the other alleged incidents involve the deployment of a taser and a takedown maneuver, they do not clearly contain such egregious facts as to indicate a pattern of repeated unwarranted use of force without ascending and measured responses to escalating force from the suspects.

Additionally, Pinder provides no evidence regarding the use of force by other officers in the County with respect to takedown maneuvers, taser deployment, or chokeholds. Further, he does not provide evidence regarding the size of the police force in the County in comparison to the number of arrests or use of force reports filed over the years involving these types of force. Without additional information, to hold the County liable here on the theory of a pattern establishing official policy would be effectively to hold the County liable for Skero on the theory of respondeat superior, which is expressly prohibited by *Monell*. *See* 436 U.S. at 694. Even if the use of force reports, therefore, were actually proven up, they would be insufficient to establish a pattern "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579.

Pinder finally alleges that the County is liable because it ratified Skero's conduct by not reprimanding him. If this Court was to reach any conclusion based upon these unproven case reports, it would be that Skero has acted appropriately on all occasions. Pinder provides no evidence regarding what happened between Skero and the County after the incident with Pinder, although he mentions related state court proceedings where Pinder was found not guilty of assault on an officer (Skero), in which he alleges that the County represented or otherwise supported Skero. Again, no evidence, authenticated or otherwise, was provided on this subject.

Supreme Court precedent makes clear that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The Fifth Circuit, however, has limited the theory of ratification to "extreme factual situations." *See Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998). This case does not represent an extreme factual situation. Additionally, the Fifth Circuit has explained "that a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality. *See Coons v. Ledbetter*, 780 F.2d 1158, 1161-62 (5th Cir. 1986) (precedent 'does *not* stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy.')." *Peterson*, 588 F.3d at 848. There is no appropriately proven evidence that anyone with policymaking authority ratified any action of Skero in Pinder's case. Fifth Circuit precedent and the lack of evidence foreclose ratification liability in this case.

In conclusion, there is no evidence to establish municipal liability under Section 1983 against the County. Accordingly, the Court grants the motion for summary judgment regarding the County.

## VI. Conclusion

The Court finds that there is no evidence to raise an issue of material fact as to any theory of liability against the County and further finds that Pinder has failed to raise an issue of material fact as to Skero's qualified immunity defense.

For the reasons given above, **IT IS ORDERED** that Plaintiff's Motion to Strike [Doc. 40] is **GRANTED**. It is further **ORDERED** that Defendants' Motion for Summary Judgment [Doc. 37] is **GRANTED**.

Signed at Houston, Texas, this 21st day of March, 2019.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE